Filed 1/15/14  Ramon S. v. Super. Ct. CA5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| RAMON S., Petitioner, v. THE SUPERIOR COURT OF KERN COUNTY, Respondent; KERN COUNTY DEPARTMENT OF HUMAN SERVICES, Real Party in Interest. | F068178 (Super. Ct. Nos. JD128017, JD128018) |
| GABRIELLA R., Petitioner, v. THE SUPERIOR COURT OF KERN COUNTY, Respondent; KERN COUNTY DEPARTMENT OF HUMAN SERVICES, Real Party in Interest. | F068179 (Super. Ct. Nos. JD128017, JD128018) |
| LESLIE S. et al., Petitioners, v. THE SUPERIOR COURT OF KERN COUNTY, Respondent; KERN COUNTY DEPARTMENT OF HUMAN SERVICES, Real Party in Interest. | F068180 (Super. Ct. Nos. JD128017, JD128018) |
| RUBEN S. et al., Petitioners, v. THE SUPERIOR COURT OF KERN COUNTY, Respondent; KERN COUNTY DEPARTMENT OF HUMAN SERVICES, Real Party in Interest. | F068181 (Super. Ct. No. JD128017, JD128018) **OPINION** |

<u>**THE COURT**</u>[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review. William D. Palmer, Judge.

David Duket, for Petitioner, Ramon S.

Keenan S. Perkins, for Petitioner, Gabriella R.

Konrad Moore, Public Defender and Valerie Renae Harrison, Deputy Public Defender, for Petitioners, Leslie S. et al.

Law Office of Glenn E. Stern and Glenn E. Stern, Jan T. Aune, and Richard Coberly, for Petitioners R.S. et al.

No appearance for Respondent.

Theresa A. Goldner, County Counsel, and Kelley D. Scott, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

**INTRODUCTION**

Petitioners seek an extraordinary writ (Cal. Rules of Court, rule 8.452 (rule 8.452)) from the juvenile court's orders issued at a combined Welfare and Institutions Code section 366.21, subdivision (f) and Welfare and Institutions Code section 388[1] hearing in which the juvenile court denied the section 388 petition and set the matter for a hearing pursuant to section 366.26. The petitioners are the potential adoptive parents, Mr. and Mrs. S.; Ramon S. (father); Gabriella R. (mother); and the children, Leslie and Laylah S.,

---

[*]     Before Levy, Acting P.J., Gomes, J., and Kane, J.

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

who were born in January 2011.[2]  We do not find error and affirm the rulings and orders of the juvenile court.

## FACTS AND PROCEEDINGS

### *Early Proceedings*

On January 9, 2012, the Kern County Department of Human Services (department), filed a petition pursuant to section 300 alleging that mother had left Leslie and Laylah with their maternal grandmother on December 31, 2011, despite being informed by the grandmother that she could not care for the children.  Mother had been leaving the children with the grandmother on a regular basis and failed to return for several days.  Mother's whereabouts were unknown.  The petition further alleged that the children were at risk due to mother's methamphetamine and marijuana use, mother had recently tested positive for marijuana, and mother had left the children with the grandmother without provisions for support.  The petition stated mother was unable to care for her children.  The children were detained on January 11, 2012.

On February 2, 2012, the children were placed with their current foster parents, Mr. and Mrs. C.  At the jurisdiction hearing on February 16, 2012, the court found the allegations in the petition true after the parents waived their rights to a contested hearing.  Father, who was being housed in juvenile hall, was permitted visits twice a month.

Mother was not present at the March 20, 2012, disposition hearing.  Father was present but in custody.  The juvenile court ordered that the parents were to receive reunification services for a period not to exceed six months.  The parents were ordered to attend parent training and substance abuse counseling and submit to random drug testing.

---

**2**  On November 26, 2013, this court denied the S.s' motion to take additional evidence and to augment the record with that evidence.

On December 4, 2013, this court, on its own motion, consolidated case Nos. F068178, F068179, F068180, and F068181.

3

Mother was also ordered to attend child neglect counseling.  The court ordered supervised visitation to occur weekly for one hour.

The social study prepared for the September 20, 2012, review hearing pursuant to section 366.21, subdivision (e), noted that mother was living in a sober living facility. Father was incarcerated in state prison and had been incarcerated during the entire reunification period.  The department received a letter from father on September 10, 2012, stating that he no longer wished to attend any dependency court hearings.  Father waived his right to visitation with the children during his incarceration.

On June 29, 2012, mother entered a residential substance abuse counseling program and completed it in 45 days.  She was referred to an outpatient substance abuse counseling program.  Between April 2012 and July 2012, mother had two positive drug tests (one in April, the other in mid-June), two failures to test that were presumed to be positive, and four negative drug tests.  Mother missed two visits with the children due to illness and showed love and affection toward the children.

The social worker noted that mother had made only minimal progress with her case plan.  Although she completed parenting and neglect classes and a 45-day residential treatment program, mother had two positive and two presumptively positive drug tests. Mother was disrespectful in the sober living facility and was removed from the program several times.  Mother's visitations were regular.  The social worker recommended reunification services for father be terminated and that they be continued for mother.  At the review hearing on September 20, 2012, the juvenile court followed the recommendations of the department, terminating reunification services for father and continuing them for mother.

On October 23, 2012, mother told the social worker that the girls were in a good home and was sure the foster parents loved them and the girls were attached to the foster parents.  Mother stated being with the foster parents was the best thing that could happen

4

to the girls and because mother loved her children, she did not want them to suffer by her side. Mother was not sure that if the girls returned to her care, she would be able to advance personally and provide for them because mother had no family support.

The foster parents were able to place the children in the Early Start program in a local elementary school on June 28, 2012. Mrs. C. reported that the girls love the program.

*Early 2013*

On January 11, 2013,[3] mother explained that she wanted what was best for her daughters and was hopeful that Mr. and Mrs. C. would adopt them. Mother observed that the foster parents were the only parents the girls had known. Mother stated that she could see how much love the girls have for Mr. and Mrs. C.

On January 17, mother called Social Worker Hernandez-Toro to tell her that a great uncle, R.S., was interested in placement. On January 22, the social worker learned that Mr. and Mrs. S. had never met the children and had no established relationship with them, but they were interested in adopting the children. The social worker had a conversation with Mr. S. after obtaining consent to discuss the case with him. Mr. S. explained that he and his wife were interested in adopting the children because they had just learned that Mrs. S. could no longer have children. Mr. S. believed he and his wife could provide a loving home for the girls. A visit was scheduled between Mr. and Mrs. S. and the children on January 29. Mother sent an email to Mr. and Mrs. S.' attorney stating that she still had parental rights, she thought her daughters should be placed within the family, and she was interested in a voluntary relinquishment to Mr. S.

Social Worker Hernandez-Toro visited Mr. and Mrs. C. on January 24, and found Leslie and Laylah dressed clean and looking well. There were no signs of abuse or

---

[3]    Hereafter, all dates refer to the year 2013 unless otherwise designated.

5

neglect. Mr. and Mrs. C. had just moved from an apartment to a house. Mrs. C. stated everyone loved the new home and the girls had more room to play. Mrs. C. reported that everyone loved the girls and they were doing well in the home. The girls were good eaters and had no trouble sleeping. Leslie was scheduled for a doctor's appointment at the end of the month for blood work to investigate a potential disorder. The girls had colds. Leslie had a boil on her leg and was not allowed back to daycare until it was gone. Mrs. C. had no other health concerns for the children.

Mrs. C. invited the social worker to view the girls' bedroom. Laylah grabbed the social worker by the hand and led her into the room. The room was clean, neat, and free of safety hazards. The girls appeared very comfortable in the home. The social worker told Mrs. C. about a relative application she had just mailed to Mr. S. and the visit scheduled for January 29. Mrs. C. understood, but was concerned that the girls were attached to their new family and could be taken from the home. Mr. and Mrs. C. were committed to adoption.

On January 25, mother contacted the social worker to express her confusion over the uncle who came "out of nowhere." Mother did not know Mr. S. and only began to talk to him the preceding week. Mother was further conflicted in her feelings because she knew the foster parents wanted to adopt the girls and she was okay with that, but on the other hand, Mr. S. was family. The social worker explained that placement with Mr. S. was not guaranteed even if he is a relative and relatives have preference when they come forward prior to the disposition hearing. The social worker reminded mother that the disposition hearing had occurred nearly 12 months ago. On January 28, Leslie was referred to a specialist by her regular physician.

The department received Mr. S.' application for relative placement on January 28. Mr. and Mrs. S. had a supervised visit with Leslie and Laylah on January 29. During the first meeting with the S.s, the girls stared at them, unsure of what to do. Mrs. S. changed

6

the girls' diapers, fed them crackers, and played with them. The social worker described the visit as a good one. On January 31, the S.s sent an email to the department seeking verification that their application had been received and further stating they had become aware of the less than adequate care that the girls were receiving.

The social worker replied with an email stating the application had been received on January 28 and had been sent to the Relative Assessment Unit that same day. The social worker also replied that she understood Mr. and Mrs. S. were concerned with the cleanliness of the girls' clothing. The social worker asked if there were any other concerns of abuse or neglect that needed to be brought to the social worker's attention. The social worker further suggested visitations occur every other week until the S.s' background checks were completed. Mrs. S. replied with an email stating that both girls had horrible diaper rash with red sores all over their bottoms. Mrs. S. further offered that the girls' hair smelled as if it had not been washed recently, Mrs. S. had seen a picture of the girls sitting on a couch with a bag of Cheeto Puffs suggesting that they were not receiving proper nutrition, and during the visit the girls ate the crackers Mrs. S. offered very quickly suggesting to her that they were not receiving enough proper snacks. Mrs. S. challenged the quality of the daycare the children were attending.

Mrs. S. had a further concern that during the January 29 visit, the girls presented with diaper rashes. The public health nurse accompanied the social worker for a home visit of the foster parents on February 7. Mrs. C. explained that the girls went to a community health clinic on January 28 and were examined by a physician and were cleared of any health concerns. Both girls developed boils again on February 4 and Mrs. C. took them back to the doctor on February 5. Laylah was seen by a doctor and prescribed Bacitracin ointment and Keflex for folliculitis, a bacterial infection. Both girls were also diagnosed with Methacillin-resistant Staphylococcus aureus (MRSA), a drug resistant bacterial infection making them more susceptible to skin rashes and infections.

The social worker had a telephone conversation with the public health nurse about Mr. and Mrs. S.' concern over the diaper rash. The public health nurse agreed to go with the social worker on a home visit to assess the girls' health.

During the home visit and evaluation on February 7, Mrs. C. stated her suspicion that the children were both allergic to cow's milk. Since recently discontinuing cow's milk, both girls had a decrease in respiratory infections and an overall improvement in their health. Both girls started getting boils again on February 4, and had a wheezing condition. Appropriate medications were provided to Mr. and Mrs. C. for treatment.

The public health nurse's evaluation of Leslie and Laylah was that both girls appeared to be healthy overall. Both girls suffered, however, from MRSA. Both girls were attending an Early Start program. There was a concern that the girls were not age appropriate in their development because they were behind in their vocabulary and the nurse recommended further screening and intervention. During the home visit, Mrs. C. invited the social worker, public health nurse, and another evaluator into the home. The house was clean with no safety hazards. The children were described as good eaters who both slept well. There were no signs of abuse or neglect. The children's immunizations were up to date. They had not been attending the Early Start program due to abscesses in the diaper area. The girls' room was neat and clean.

Mrs. C. explained that she was taking the children to the doctor to treat the diaper rashes and abscesses as soon as she spots redness. She was giving them prescribed antibiotic cream and oral medication to control the condition. The public health nurse explained that because the girls have sensitive skin and MRSA, they are both more susceptible to skin conditions. Leslie had been referred to Valley Children's Hospital for a possible endocrine condition. Mr. C. was contacted by phone during the visit and indicated that he was still interested in adopting both children. The girls had a snack consisting of blueberry muffins and almond milk during the visit.

On February 11, a social worker met with Mr. and Mrs. S. to review the adoption process and the girls' current caretaking situation. Mr. and Mrs. S. were informed of the children's medical conditions, potential allergies, and the fact that both children had specialized needs. The social worker explained to Mr. and Mrs. S. that the foster parents loved the girls deeply, had developed a bond with them over the last year, were in a new and clean home, and there was ample love displayed toward each child.

Mr. and Mrs. S. met with the children for a supervised visit at the department on February 25. Mr. and Mrs. S. set up a table with snacks and juice. They also brought a soft piano keyboard mat that played music, a laptop game, a bowling game, and balloons. The girls smiled and giggled as they played with the balloons. Mrs. S. changed the girls' diapers. Mr. and Mrs. S. kissed the girls goodbye at the end of the visit.

### Section 388 Petition

On February 11, Mr. and Mrs. S. filed a petition pursuant to section 388 seeking transfer of custody of Leslie and Laylah to them from foster care. Mr. and Mrs. S. stated they sought adoption of both children and were family members. The petition alleged that Leslie and Laylah were not receiving proper care because the foster parents left them dirty, hungry, and suffering from diaper rashes. Mr. and Mrs. S. further alleged the girls were wearing dirty clothes, their hair was unwashed, and their fingernails were long and dirty.

There were also allegations that the foster parents did not leave appropriate medicines for the first supervised visit, one of the girls immediately called Mrs. S. "mommy," and the foster parents left the children with Mr. and Mrs. S. without a hug or explanation that they would soon return. The section 388 petition stated that Mr. and Mrs. S. had sufficient income to care for both children and the girls developed an instant bond with them.

9

*Team Decision Meeting*

The department conducted a Team Decision Meeting on March 8. The meeting included the social worker assigned to the case, Beatriz Hernandez-Toro; social worker Jamie La Favor; the adoptions social worker, Gayle Achuff; Mr. and Mrs. C. (also referred to as substitute care providers or SCP); Mr. and Mrs. S.; public health nurse Monique Moreland; foster family agency social worker Michelle Perez; facilitator Anne Sarazin; and Macy Albertson from the department. Bonding with Mrs. C. was described as loving and affectionate. Mrs. C. did not coddle the children when they cried during tantrums. Mr. C. was described as being the children's world. After a visit with Mr. and Mrs. S., the girls ran to Mr. C. Mrs. C. said the girls always ran toward Mr. C. when he returned home from work and adored him. The bond between the children and Mr. and Mrs. C. was evident.

Mrs. S. was observed to be very loving and affectionate with the children during her visit. She conveyed a positive demeanor, smiled, and had positive responses to the children's needs. Mr. S. was appropriate in his interactions with the children. The ability of Mr. and Mrs. S. to create a bond was evident. Both sets of potential adoptive parents were "willing and wanting" to adopt both children and willing to undergo an Adoptive Home Study. The girls suffered from MRSA and asthma.

Monique Moreland, the public health nurse (Nurse Moreland), found Mr. and Mrs. C. knowledgeable about the children's medical needs and found no evidence or documentation that they were at fault for the children's MRSA. The C.s had difficulty getting Leslie an appointment with an endocrinologist, but this was caused by systemic problems with Valley Children's Hospital denying the primary care physician's request for a consultation with an endocrinologist.

Mr. and Mrs. C. felt as if the girls were their family. They felt bonded to the girls and vice versa. Mr. and Mrs. C. have a teenage child who the girls think of as a sibling.

10

Mr. and Mrs. C.'s extended family treat the girls as their biological family. Also, the C.s have maintained and are willing to continue a connection with the children's biological family. Mr. and Mrs. S. are part of the children's biological family. Mr. and Mrs. S. would have been caretakers at the beginning of the dependency proceedings but were under the impression that the children were being returned to mother. If they received custody of the children, Mr. and Mrs. S. would agree to maintain a lifelong connection with Mr. and Mrs. C.

The department concluded that Mr. and Mrs. C. had shown the ability to maintain both children in their home since February 2012, or 13 months at the time of the Team Decision Meeting. The department also believed there was no reason that the children would not be stable in placement if moved to Mr. and Mrs. S., though there was no evidence to support that conclusion at that point. At the conclusion of the meeting, it was evident that both placement options would lead to a happy, healthy, secure childhood for both children. The department was reluctant to remove the children from their current placement because they knew their current placement as their home. The relatives disagreed with this assessment. It was agreed to permit overnight visitation with Mr. and Mrs. S. until the matter was heard by the juvenile court.

On March 27, the juvenile court granted Mr. and Mrs. C.'s request for defacto parent status.

***Visitations with Mr. and Mrs. S.***

The girls had a weekend visit with Mr. and Mrs. S. between March 8 and March 10. Mrs. C. reported that when the girls were returned, they both had diarrhea. Mrs. C. thought it may have been from eating something they were not used to eating. Leslie appeared relieved once she saw their home and started laughing and became more talkative.

11

Social Worker Hernandez-Toro spoke to Mrs. C. on March 25, after the girls had an overnight visit with Mr. and Mrs. S. Mr. C. dropped the children off for the visit. The process was very emotional. Both girls cried hysterically and held tightly onto Mr. C. The girls again experienced diarrhea after returning to the C.s' home. Mr. C. did not believe there should be future overnight visits. Mr. C. conveyed this same information to Social Worker Hernandez-Toro the next day.

Hernandez-Toro talked to Mr. and Mrs. C.'s teenage child on March 26 during a home visit. The teenage child said that Leslie and Laylah were very attached to everyone in the home. When Leslie and Laylah returned home, they ran inside to hug the teenage child, who in turn, hugged and kissed each child. Hernandez-Toro found the home to be clean and free of safety hazards. The C.s reported that the girls continued to do well under their care. They were good eaters and had no trouble sleeping. Leslie had a positive report from her blood tests indicating no genetic abnormalities.

On April 4, Mrs. C. wanted to cancel an upcoming weekend visit with the S.s because the girls were sick and were taking antibiotics. Mrs. S. wanted to continue with the visit anyway and asked that all medications be included. Mrs. S. did not want to continue the visit until the following weekend, insisting that she was competent to care for the children. The S.s insisted on keeping the visit as scheduled. The C.s reported that the children are very stressed out by the visits with the S.s and cry and cling to the C.s prior to departure. They also return from the visits with diarrhea. The girls also have a bad attitude upon their return and resort to grunting and fighting with each other. In April, the department recommended that the children remain with Mr. and Mrs. C.

Information provided in a supplemental report signed by Social Worker Carrie Burton on June 19, stated that on April 9, Mrs. S. wrote an email to the department claiming that Leslie only became upset when being transferred to the S.s after Mr. C. woke her up from a sound sleep. According to Mrs. S., upon return, the girls cried when

12

they saw the C.s.  Mrs. S. explained that the girls were very affectionate toward them and gave her and Mr. S. hugs and kisses.

On April 19, the department assigned a human service aide to assist with the transportation and exchange of the children to the S.s.  After the April 22 visit, Mrs. C. noticed a boil on Leslie that was not present prior to the visit with the S.s.  The S.s did not report the boil to Mrs. C.  The department received two referrals against Mr. and Mrs. C.  An allegation was made on May 7, that Mrs. C. gave the girls over-the-counter cough syrup that clearly stated it was not to be given to any child under age six.  The children's clothing was too small and Leslie cried out in pain as she dressed herself.  Social Worker Hernandez-Toro confirmed that Mrs. C. had a doctor's note prescribing the cough syrup to the children.  On June 18, Social Worker Stacey Fox found this allegation to be unfounded.

On May 7 after a visit with Mr. and Mrs. S., Mrs. C. told Social Worker Hernandez-Toro that Leslie was moody, as usual, after visiting Mr. and Mrs. S. and the girls were fighting with each other more than usual.  Leslie returned from the visit with diarrhea.  Mrs. C. packed all of the girls' medications, whether or not they were needed.  Medication packed for one of the girls who had a bad cough was not returned.  The relatives returned a different over-the-counter cough medication instead.

Hernandez-Toro reported that she was present in a Kern County parking lot on June 1, when Mr. and Mrs. S. returned the girls from an overnight visit.  Mr. and Mrs. C. were late in picking up the children because Mrs. C. was stuck in traffic and she lost phone reception.  The girls seemed upset with Hernandez-Toro and asked for Mr. C., whom they called "daddy."  Mr. C. had been resting after work, but immediately got in his car and arrived to the meeting place.  The girls seemed upset until they got into Mr. C.'s car.  Hernandez-Toro noticed a drastic change in the girls' attitude.  They started to giggle and wanted to play with Hernandez-Toro.

On June 17, another referral was made to the department alleging that the girls continued to have MRSA, the foster mother does not hug the children, the children's clothing does not fit, the children have blisters all over their feet, and they arrive for visits with dirty hair, fingernails, and clothing. There was an allegation that the children have dirty diapers and the foster parents failed to provide a nebulizer. Mr. and Mrs. S. further alleged that the girls had red marks around their legs that looked like burns and their genital area was red.

Social Worker Burton contacted Nurse Moreland who reported that on June 18, the girls had a doctor appointment. The doctor confirmed that both girls were free of MRSA boils or abscesses and was continuing treatment with an intranasal cream and bleach baths. Nurse Moreland confirmed with the doctor that bleach baths can cause the bottoms of children's feet to peel. Nurse Moreland provided Burton with a chart of every doctor visit the children had dating back to February 2012. The chart showed the foster parents had been very proactive in the children's medical care. The charts were attached to the social worker's report. The foster parents had taken each girl to see a physician more than 20 times since becoming the care providers.

The department sought to have the court order supervised visits with Mr. and Mrs. S. to occur monthly for two hours. The department further requested the visits be limited to Kern County. The department concluded that visitations with the S.s had become detrimental. The department reported the foster parents had been very diligent in attending to the children's medical needs and that the children had been exposed to MRSA prior to their placement into protective custody. The doctors reported that the children were more susceptible to skin conditions and the foster parents had followed all of the doctor's orders.

The department further observed that Mr. and Mrs. S. had taken it upon themselves to stop prescribed medication when one child was ill and to provide a

14

different cough medication. The S.s had failed to return prescribed medications to the foster parents. The department stated that the S.s "have continually called or emailed Social Service Supervisor Albertson to report the same issues over and over again."

The department explained it had addressed all of the issues raised by the S.s and that the S.s were not satisfied with the outcome. The department concluded that Mr. and Mrs. C. have provided excellent care for the children and the department had not documented any issue concerning the care the children were receiving. The department described the C.s as providing a healthy, loving, and stable home for the children. The department concluded that it had found no evidence to support the truth of any of the allegations by the S.s. The department, therefore, sought a reduction in visits by the S.s because it was no longer in the children's best interests to maintain a continued relationship with them. It was further in the children's best interests to remain with the current foster parents who remained committed to adopting them and who had cared for them for 17 months.

### Relinquishment of Parental Rights to Private Adoption Agency

Alison Foster Davis is counsel for Family Connections Christian Adoptions (adoption agency), a private non-profit adoption agency licensed by the California Department of Social Services. Davis prepared a declaration under penalty of perjury setting forth that in May 2013, father executed waivers of his right to further notice of adoption planning for Leslie and Laylah, in effect, relinquishing his parental rights. The father's waiver documents were attached to Davis's declaration.

Davis declared that on May 6, 2013, mother signed California designated relinquishment documents naming Mr. and Mrs. S. as the intended adoptive parents for Leslie and Laylah. Davis declared these documents were submitted to the state on May 10, and that her adoption agency was awaiting the receipt of the Acknowledgment from the California Department of Social Services. Davis filed a notice of accepting

15

mother's relinquishment that was filed by FAX. Copies of the documents allegedly executed by mother and sent to the California Department of Social Services were not attached to Davis's declaration.

Davis stated in her declaration that Mr. and Mrs. S. retained the adoption agency to complete a domestic adoption home study assessment and were approved for adoption of the minors on April 29. In her declaration, Davis requested a stay of the dependency proceedings until the adoption is finalized.

### *Joint Section 366.21, Subdivision (f) Review Hearing and Hearing on Section 388 Petition*

The joint section 366.21, subdivision (f) and section 388 hearing was extended, beginning on June 5, and continuing in different sessions until September 11. The court conducted a subsequent ex parte hearing on a motion brought by the S.s after the joint hearing began to consider the issue of whether the S.s would have immediate custody of the children and, alternatively, to maintain unsupervised visitation with the children. The court noted that there was no court order concerning relative visitation. The court found that the department retained discretion concerning relative visitation and denied the S.s' ex parte motion to change custody or to maintain unsupervised, ongoing visitation with the children. Visitation with the S.s was changed to supervised visits once a month for two hours.

### *Testimony of Alison Foster Davis*

Davis testified that her adoption agency was licensed by the State of California. The adoption agency does assessments of families seeking to adopt. The adoption agency recommended that Mr. and Mrs. S. become prospective adoptive parents after completing an assessment. Davis described Mr. and Mrs. S.s' commitment to the adoption process as exemplary. Davis described Mr. S.'s relationship with his extended family as a whole to be good, although they were not immediately aware of the

16

dependency action. An adoption, however, cannot occur in the context of a dependency action until after the parental rights have been terminated and the child is freed for adoption.

***Testimony of Mr. and Mrs. S.***

Mr. S. testified that he first learned of the girls' birth when he was informed by father that they were about to be born. Mr. S. was very busy at the time with three jobs. Also, Mrs. S. had surgery in 2011. Because of his own family's needs, Mr. S. was not able to give the matter the attention it deserved. In late November or early December 2012, Mr. S. learned that father and mother had lost the girls, but was misinformed by another family member that the girls were adopted.

Mr. S. stated that he was his nephews' and nieces' favorite uncle and he regularly called them. Mr. S. explained that father stopped talking to family members when he was age 14. Mr. S. did not visit father during father's incarceration, but did talk to father on the phone. Although Mr. S. was in regular contact with his nephews and nieces, and talked to father, Mr. S. said he was unaware that Leslie and Laylah were in protective custody because no one ever mentioned it.

Mr. S. stated that between February 2012 and December 2012 he had no contact with father and next talked with father in January 2013. Some of father's siblings saw Mr. S. at a birthday party, in March 2012, and Mr. S. learned the girls were staying with their maternal grandmother.

On one occasion after the children were born, Mr. S. asked his brother to find father. The brother was unsuccessful. Between the time the children were born and when he learned the children were in foster care, Mr. S. never tried to contact mother or the maternal grandmother. Mr. S. denied telling Supervising Social Worker Macy Albertson months before December 2012 that he was aware the girls had been removed from mother's custody.

17

During the first visit with the girls on January 29, Mr. S. observed Mrs. C. leaving the room without saying anything to them. One child's diaper was soiled and leaking. Changing the diaper, Mrs. S. found a horrible rash and boils. Mr. S. stated that on the second supervised visit, the girls came right up to the S.s and enjoyed themselves during the visit.[4] Mr. S. stated that on a visitation on April 4 the foster parents sought to reschedule the visit because the girls were sick. When the children arrived, they were bright eyed and smiling, not sick.

Mr. S. explained that later drop-off visits to the S.s' home were done by a social worker and not the C.s. According to Mr. S., the girls' clothes and shoes were always too small and the S.s would immediately change what the girls were wearing. During the eighth visitation, Laylah was fussy. The S.s changed her diaper and were appalled at how bad her diaper rash appeared. Mr. S. explained there were eight overnight visits and the girls got along well with their three-year-old child. The S.s were concerned when the girls were obsessed by their shoes and removed them. The S.s went to a store and purchased new shoes that were larger.

Mrs. S. testified that she read to the girls from the first visit. Her own child is a good reader. Mrs. S. testified that from the first unsupervised visit, the girls ran up to the S.s, put their arms out, hugged the S.s, and got right into the car. Mrs. C. did not say anything to the girls. During the second visit, Laylah was really happy to see the S.s and was smiling and laughing. Leslie cried for only five minutes, and then started smiling and laughing. From the third unsupervised visit and thereafter, the girls were excited to see the S.s and would run to see them. During the first of the extended visitations, the C.s

---

[4]    The social worker's report states that the children were initially hesitant to part from Mrs. C.

would fail to provide the girls' medication. Later the medications were packed with the girls' things.

During an early overnight visit, the C.s failed to provide the girls with provisions such as toothbrushes and the girls' clothes seemed too small. On cross-examination, Mrs. S. conceded that the C.s did not always send the girls for extended visits with clothes that were too small for them. Sometimes the girls were sent on the visits with clothes that fit them. For the first three overnight visits the girls were sent with shoes that were too small, but thereafter the girls had shoes that fit.

Mrs. S. stated that the girls called the birth mother and Mrs. C. mom, but called her mommy by the second weekend. Mrs. S. said that the girls would cry when leaving the S.s after overnight visitations began. Mrs. S. would go into the back seat of Mrs. C.'s car to console the girls and they would stop crying. Mrs. S. was asked when she first learned the girls had been removed from their mother. She replied that three to three and a half weeks prior to Christmas 2012 they learned from a niece that the children were with their maternal grandmother and mother had to attend some type of classes.

### Testimony of Dr. Jeffrey Arden

Dr. Jeffrey Arden, a licensed psychologist, does comprehensive child custody evaluations in Southern California and the State of New York and testified as the S.s' expert witness. Dr. Arden explained that most children know their primary attachment figure by nine or ten months of age. Thereafter, children can develop multiple attachments to adults and other children. Attachments and bonds are generally stronger between biological relatives.

Dr. Arden explained that based on literature in this field, the best time to begin a child in preschool is age four, or perhaps age three. The ability to speak and the absence of potty training can have an effect on a child entering a preschool program. It may or may not negatively affect the child's self-esteem. According to Dr. Arden, speech

19

development is very important to a child's ability to achieve higher cognitive development.

Children usually have a vocabulary of between 350 and 700 words by the time they are two and a half or three years of age. If a child age two had a vocabulary of only 30 words, Dr. Arden would be concerned.[5] A speech development delay can cure itself or improve through the use of a speech and language pathologist. Family involvement, including reading from age appropriate books, can also help with delayed language skills.

According to Dr. Arden, a properly stepped transition not done too abruptly could be done for the children. If there had been visitations for three or four months and they were stopped abruptly, Dr. Arden opined this would be harmful to children. Dr. Arden testified that stability and continuity are important for a child's development.

*Testimony of Department Staff*

Social Worker Hernandez-Toro was the second social worker assigned to the children's case. Hernandez-Toro did not conduct a new search for relatives when she was assigned the case. In her review of the file, Hernandez-Toro saw that relatives on both the paternal and maternal side of the girls' families were notified of the dependency by a court intake worker. The maternal and paternal grandmothers were called and sent letters. Two other people submitted applications for custody, but they were later withdrawn.[6]

---

**5** When they were one and one-half years old, the girls each had a vocabulary of 10 to 15 words. At the time of the Team Decision Meeting in March 2013, Nurse Moreland was initiating a referral based on the children's "limited speech." It is unclear from the record what the precise vocabulary was for each child at the time of the joint hearing. We accept as an established fact that both children had a limited vocabulary and that Nurse Moreland was seeking a referral for treatment.

**6** Dina Tucker was the social worker responsible for the intake of Leslie and Laylah. The maternal grandmother contacted the department to take the children into custody. The mother and father could not initially be located. The department at that time relied

The children are attending a Head Start, Early Start program in a local school through the Community Action Partnership of Kern. The program is a readiness program to prepare children to attend school. The curriculum includes vocabulary, reading, math, social and developmental skills, and physical and social development skills. Hernandez-Toro believed the children had progressed satisfactorily since attending the program.

Hernandez-Toro described the C.s as "wonderful foster parents." The S.s had eight overnight visits with the girls. They picked the girls up on Fridays and brought them back on Sundays. Hernandez-Toro observed the girls on occasions when the S.s returned them and described the girls' interaction with the S.s as minimal. The girls did hug the S.s goodbye. Hernandez-Toro described the girls as always very happy to see the C.s when they return from overnight visits. Sometimes the girls would cry upon returning, but they were "very happy to return."

The S.s had complained about the first meeting with the girls starting 15 minutes late. Mrs. C. thought the meeting was in a different building. Hernandez-Toro gave the S.s an entire hour with the girls to make up for the lost 15 minutes. Mrs. C. helped

---

on family members to find potential family caretakers. The department now has a family finding unit, added in response to new legislation. The maternal grandmother only had the name of a family friend. Tucker did not look up other members of the S. family in the phonebook and the department did not have internet services at that time.

Father was eventually found after he was taken into custody. Father did not first appear at any hearing until the jurisdiction hearing on February 16, 2012, did not raise his status as a parent until then, and was only an alleged father at that time. At the disposition hearing on March 20, 2012, father was designated as the presumed father. Children, however, cannot be placed with paternal family members until paternity is established. The department can place children with "a non-relative extended family member" where there is an existing close bond between that person and the children.

Neither parent identified potential relatives who could be caregivers. Prior to the detention, an emergency response worker had been working with mother and the maternal grandmother trying to help them keep the girls, but those efforts "blew up" after mother left the children with the grandmother and disappeared.

21

Hernandez-Toro place the girls in the visitation room. Mrs. C. verbally reassured the girls that everything was going to be fine, she would be back, and for the girls not to worry. Mrs. C. did not linger but left immediately as to not upset the girls.

Hernandez-Toro explained that on the occasion that Mrs. C. was an hour late in picking up the children from an overnight visit, Mrs. C. had gotten stuck in traffic and lost reception for her cell phone. Mrs. C. was not ignoring the situation. Hernandez-Toro went to the C.s' house and contacted Mr. C. The two proceeded to the exchange location and arrived at about the same time as Mrs. C.

Hernandez-Toro witnessed the children returning from overnight visits. The girls had been upset upon their return, but not at having to go back to the C.s. The girls were upset at Hernandez-Toro. They would not look at Hernandez-Toro and they would ask for Mr. C., asking for "daddy." There were times when the children were hesitant to go on overnight visits with the S.s.

Hernandez-Toro investigated allegations that the girls' clothes and shoes did not fit them. Going to the C.s' home and examining the clothing provided to the children, Hernandez-Toro did not find clothes or shoes that were too small. As for medical attention, Hernandez-Toro explained that the girls were taken to the doctor many times; at least once a month, and often more frequently if necessary. Hernandez-Toro noted that the S.s referred to themselves to the girls as mommy and daddy from the first visit.

Social Worker Albertson testified that Mrs. C. never tried to keep the children from mother and the C.s were cooperative with the reunification process. In February 2013, the C.s definitely wanted to pursue adoption of the girls. It was difficult because family members had come forward late in the process. Albertson described Mr. C. as "100 percent wanting to adopt." Mr. C. described the children as "his girls" and told Albertson they had cared for them since they were little. There was a difference in Mrs. C.'s feelings toward adoption because Albertson thought Mrs. C. "was concerned about a

22

situation such as this unfolding," a "debate over where the children should be." The C.s wanted to keep the girls.

Albertson had a contact with the S.s in which they explained to her that they announced their plan to adopt the girls but learned from a relative at Christmas that the girls were in foster care. Mr. and Mrs. S. were shocked to learn this because they thought the girls would be returned to mother after a few weeks. The S.s had learned prior to this, however, that the girls had been removed from mother's custody.

Albertson testified on August 27, 2013. Mr. and Mrs. S. had not called the department or Albertson to check on the girls since July 30, 2013. Albertson checked with Hernandez-Toro and learned that the S.s had not called to schedule a visit in August 2013.

Nurse Moreland testified that Mr. and Mrs. C. were diligent in their efforts to obtain an endocrinology referral for one of the girls even though it took from May 2012 to March 2013 to resolve the issue. Moreland explained that Valley Children's Hospital gave multiple reasons for not accepting such a referral for a child under 10 years old. After placing more pressure on the hospital, the hospital provided information clearing the child of a problem because they had already seen her a few days after her birth.

Concerning the dispute over whether the C.s failed to obtain medical treatment for MRSA boils on the children between January 29, 2013, and February 5, 2013, Moreland was asked if it was inconceivable that the foster parents failed to change the girls' diapers for seven days. Her reply was, "Yes." When asked if the safest thing would have been for the C.s to take the girls to the doctor on January 30, Moreland replied the answer was yes if they were MRSA boils. It would not have been safe practice to wait between January 29 and February 4 to seek medical treatment. After receiving prescribed bleach baths to treat MRSA, the skin on the children's feet could have blister-like marks and peel.

23

Concerning the girls' speech delay, Moreland made a referral to the Kern Regional Center. Mr. and Mrs. C. followed up with the referral. Moreland also explained that caregivers start children in Head Start to encourage growth in areas that are delayed.

***Testimony of Mr. and Mrs. C.***

Mrs. C. testified at length concerning the children's many medical problems and her elaborate care for them. Mrs. C. did not learn that the girls were going on their first overnight visit with the S.s until the conclusion of the Team Decision Meeting. Prior to this, no one suggested to her there would be overnight visits. The exchange of the children to the S.s occurred at the children's school. Mrs. C. was not given a proper opportunity to get things together for them, to clean them, or to change their clothes at the end of school.

The girls wear different sized clothes. Leslie is larger than Laylah. The shoes sent back with the girls from the S.s were too big for Leslie and would fall off. The shoes for Laylah were also too large.

Mrs. C. also explained why she was late meeting the S.s on one occasion to pick up the children. Mrs. C. had been visiting a relative in Atascadero and left in time to make the exchange, giving herself nearly three hours. There was an accident on the highway that delayed her trip between 45 minutes and an hour. Mr. C. had worked a late night shift the night before. Mrs. C. was unable to contact Hernandez-Toro until she was in Bakersfield.

Mrs. C. described the adoption process as full of ups and downs. When the C.s first got the girls, they were excited about adoption. As time passed, it looked like mother was getting better and there would be no adoption. Then more time passed and mother contacted the C.s and indicated she wanted the girls adopted. Mother stated the only way she would allow adoption was if the C.s were the adoptive parents. Then the S.s became interested in adoption. During that entire span of time, Mrs. C. discussed

24

adoption with her husband.  Mrs. C. never waivered in her desire to adopt the girls.  Mrs. C. believed the girls were integrated into her family.

Mr. C. testified that when the girls returned from overnight visits, they would jump out of their car seats.  Mr. C. said that the girls never left the S.s car or returned to it crying hysterically because they wanted to stay with the Mr. and Mrs. S.

*Juvenile Court's Findings*

On October 4, 2013, the juvenile court issued its minute order denying Mr. and Mrs. S.'s section 388 petition and setting the matter for a section 366.26 hearing on February 3, 2014.   The minute order included an attachment of the juvenile court's written rulings and findings.

The court found that the best interest of Leslie and Laylah requires they stay in their placement with the foster parents and it is not in the best interest of the children for the proposed private adoption with the S.s to go forward.  The court found the proposed relinquishment appears to be inconsistent with the stated wishes of the mother, who, on more than one occasion expressed support for the C.s to adopt her daughters and also stated she did not know the S.s.

The court noted there was a clear conflict in the facts between the S.s and the C.s. In judging credibility, the court first found that counsel for the S.s, either intentionally or unintentionally, misstated material facts.  The court found the social workers, public health nurse, and Mr. and Mrs. C. to be credible witnesses on material issues and found Mr. and Mrs. S. not to be credible.  The court noted particular concern for the apparent motivation of the S.s to gain custody of the children after they found they could no longer have biological children.

The court stated there was independent evidence of a close, caring, and loving relationship with the C.s and the girls.  The relationship with the S.s was described only by them.  Based on expert medical testimony, the C.s took appropriate medical care of

25

the girls. The S.s presented no medical testimony. The C.s properly clothed and cared for the girls. Based on its determination of credibility, the court held "the evidence is clear and overwhelming that the best interest of Leslie and Laylah requires that they stay in the care of the [C.s] thus enjoying a safe, stable, caring family who properly cared for them in all apparent ways."

The court further found that although the case was still in technical reunification, the reality was that both father, who was no longer reunifying, and mother, who conceded her efforts to reunify had failed, were no longer reunifying. The court stated this is also demonstrated by the parents' attempted relinquishment. Citing section 361.3, the court noted preference for relatives is established at the very beginning of a dependency action and again if there is a new placement. (See subdivisions (c) and (d) of section 361.3.)

## REVIEW OF RELINQUISHMENT TO PRIVATE ADOPTION AGENCY

*Introduction*

Mr. and Mrs. S. have filed a petition for extraordinary writ review seeking appellate court review of the juvenile court's orders denying their section 388 petition and setting the matter for a hearing pursuant to section 366.26. Father filed his own petition, also with points and authorities, agreeing with the position adopted by the S.s. Mother and the children have filed petitions joining with the arguments of father and the S.s.

The S.s' points and authorities are lengthy. Their arguments, however, can be summarized as two contentions. First, they inaccurately argue the juvenile court was unaware of the burden of proof for voluntary relinquishment cases and placed the matter up for a vote by counsel for each of the parties. The S.s argue that there was no clear and convincing reason to deny the voluntary relinquishment, which they argue is legally favored.

26

Second, reviewing all of the factors for child placement in section 361.3, the S.s contend there was insufficient evidence to support the juvenile court's findings. A separate component of the second argument is that the juvenile court abused its discretion in making its credibility findings and failed to properly consider the preference for relative placement. We disagree with these contentions and deny petitioners' extraordinary writ.

As we explain below, these arguments fail to set forth the legal and statutory distinction between relinquishment of parental rights to a private adoption agency and relinquishment of parental rights to a public adoption agency. The juvenile court made its factual findings by a standard of clear and overwhelming evidence, an evidentiary standard greater than clear and convincing evidence. We further find that the S.s are trying to reverse the standard of review we employ to the petitioners in a section 388 hearing when reviewing the juvenile court's orders on appeal, or in this instance, an extraordinary writ proceeding.

Father's petition argues the more subtle legal point that it is unclear the juvenile court correctly applied the primary published authority concerning relinquishment of parental rights to a private adoption agency, *Teresa J. v. Superior Court* (2002) 102 Cal.App.4th 366 (*Teresa J.*). Father further argues that the juvenile court did not make a legal finding, as required by *Teresa J.*, that it was in the children's best interests to limit the parents' right to relinquish them to a private adoption agency, and only found it was in the best interests of the children to leave them with the foster parents. Although father has raised an arguable legal issue, we conclude the juvenile court made the necessary findings involving voluntary relinquishment to a private adoption agency.

27

*Analysis*

In *Teresa J.*, the mother was serving a prison sentence when she gave birth to the minor. A dependency action was initiated and two foster parents, D. and K., became the caregivers of the child from the time he was two days old. (*Teresa J.*, *supra*, 102 Cal.App.4th at pp. 368-369.) D. and K. stated they were willing to adopt the minor. Two days after the joint jurisdiction/disposition hearing, the department removed the minor from D. and K. and placed him with V. and B. The court granted an order that D. and K. were defacto parents. Later, V. and B. successfully obtained an order that they were also defacto parents and the matter was set for a section 366.26 hearing. (*Teresa J.*, *supra*, at p. 369.)

The mother then executed a statement of understanding and a relinquishment, relinquishing the minor to ICA, a private adoption agency, with a statement of understanding naming D. and K. as adoptive parents. (*Teresa J.*, *supra*, 102 Cal.App.4th at pp. 368, 370.) The State Department of Social Services (DSS) signed an acknowledgment and receipt of relinquishment two days later. (*Id.* at p. 370.) D. and K. moved to vacate the section 366.26 hearing, transfer the minor to ICA, and continue the matter for a six-month review hearing. (*Teresa J.*, *supra*, at p. 370.)

Two weeks later, the chief of the adoptions policy bureau of DSS wrote ICA that the acknowledgment of the relinquishment was void because it did not comply with section 361, subdivision (b) (hereafter section 361(b)) because DSS's interpretation of the statute was that a parent could only relinquish a child to DSS or a licensed county adoption agency. According to DSS, relinquishment to a private adoption agency was not permitted. On October 30, 2001, the juvenile court agreed with DSS's interpretation and found the relinquishment to a private adoption agency invalid. The parties stipulated D. and K.'s home was suitable for the minor and the modification hearing was continued and joined with the section 366.26 hearing. (*Teresa J.*, *supra*, 102 Cal.App.4th at p. 370.)

28

The mother, and D. and K. petitioned the appellate court, inter alia, for a writ of mandate commanding the juvenile court to set aside its order of October 30, 2001, enter an order vacating the section 366.26 hearing, direct the department to deliver the minor to the custody of D. and K, and to direct DSS to refrain from refusing to acknowledge relinquishment of a child to a private adoption agency. (*Teresa J.*, *supra*, 102 Cal.App.4th at p. 370.)

In a detailed statutory analysis, the court in *Teresa J.* found that the legislative intent behind Family Code section 8700 and Welfare and Institutions Code section 361(b)[7] was to permit adoptions both to licensed public adoption agencies and licensed private adoption agencies. (*Teresa J.*, *supra*, 102 Cal.App.4th at pp. 371-374.) According to *Teresa J.*, read in context, section 361(b), does not limit a parent's ability to relinquish a dependent child for adoption. Rather, it limits the juvenile court's ability to interfere with that decision "*when the relinquishment is to a public adoption agency.*" (*Teresa J.*, *supra*, 102 Cal.App.4th at p. 374 [emphasis added]; *In re R.S.* (2009) 179 Cal.App.4th 1137, 1147-1155 (*R.S.*).) *Teresa J.* further rejected the public agencies' argument that the parents in delinquency proceedings could not relinquish a child to a licensed private adoption agency. (*Teresa J.*, *supra*, 102 Cal.App.4th at pp. 374-375.)

*Teresa J.* held that a juvenile court retains its jurisdiction over a dependent child who is subject to a permanent plan for adoption until the adoption is final pursuant to section 366.3. Under section 362, subdivision (a), "the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child, including medical treatment, subject to further order of the court." The court

---

**7** Section 361(b) provides: "Subdivision (a) does not limit the ability of a parent to voluntarily relinquish his or her child to the State Department of Social Services or to a county adoption agency at any time while the child is a dependent child of the juvenile court, if the department or agency is willing to accept the relinquishment."

29

may also limit a parent's control over a dependent child under section 361, subdivision (a) [hereafter section 361(a)], with the sole exception where the parent relinquishes the child to a public adoption agency pursuant to section 361(b). This particular exception, however, does not apply where the parent relinquishes the child to a private adoption agency. In such a case, "the juvenile court retains its broad power to limit the parent's control over the dependent child, which includes the parent's ability to relinquish the child to a private adoption agency." (*Teresa J.*, *supra*, 102 Cal.App.4th at p. 375.)

The *Teresa J.* court further explained that when the juvenile court exercises its power to limit the parent's control: "the juvenile court may consider the concerns raised by the various real parties in interest and whether such concerns militate against allowing the relinquishment to a private adoption agency. In this decision, as in all others, the juvenile court must act in the best interests of the dependent child. (§ 202, subd. (e).)" (*Teresa J.*, *supra*, 102 Cal.App.4th at p. 375.)

The *Teresa J.* court found that the juvenile court in that case failed to declare the relinquishment invalid in exercise of its power under section 361(a) and to make a finding that the relinquishment to the private adoption agency was not in the best interest of the minor. The juvenile court operated under the misconception that the mother could not relinquish her child to the private adoption agency. *Teresa J.* found the juvenile court misunderstood the law and its own discretion, and remanded the case for the juvenile court to consider whether it should limit the mother's control over the minor as it relates to relinquishing him to the private adoption agency, considering the minor's best interest at the time of the hearing. (*Teresa J.*, *supra*, 102 Cal.App.4th at p. 375.)

*Teresa J.* further explained that the proper standard for reviewing the placement decision of the agency that has been given exclusive care and control of the minor is not the differential abuse of discretion standard because the parent of the dependent child no longer has exclusive care and control of the child. The juvenile court retains the authority

30

to make reasonable orders for the child's care, supervision, and custody under section 362, subdivision (a). "Limiting the parent's ability to relinquish a dependent child to a private adoption agency is such an order when it is in the child's best interest." (*Teresa J.*, *supra*, 102 Cal.App.4th at p. 376.)

The petitioning parties also rely on *R.S.* which held that once children are relinquished to a public adoption agency, and the adoption to that agency becomes final, the juvenile court is precluded from making any order limiting the parent's right to relinquishment when the section 366.26 hearing is scheduled but has not yet occurred. The relinquishment ends the need for a hearing to select a permanent plan under section 366.26. (*R.S.*, *supra*, 179 Cal.App.4th at p. 1155.)

Citing *R.S.* and Family Code section 8700, the S.s' petition seeks a broad expansion of the *R.S.* holding to include, for all practical purposes, private as well as public adoption agencies. We decline petitioners' invitation to limit the power of the juvenile court under section 361(a) to establish the best interest of the children where, as here, the parents have relinquished their parental rights to a private adoption agency. We find *R.S.* factually inapposite to the facts in the instant action and do not apply its holding here.

We also reject the S.s' legal construction that effectively reverses the burden of proof in a section 388 hearing because the proceeding involves voluntary relinquishment to a private adoption agency. A parent, or in this case relatives to the children, may petition the juvenile court to vacate or modify a previous order on grounds of change of circumstance or new evidence. (§ 388, subd. (a).) The parent or petitioner must also show that the proposed change would promote the best interests of the child. (§ 388, subd. (d); Cal. Rules of Court, rule 5.570; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)

31

The parent or petitioner bears the burden of showing in a section 388 petition, that both a change of circumstance exists *and* that the proposed change is in the best interests of the child. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47 (*Casey D.*).) Petitioners at the section 388 hearing had the burden of proof, by a preponderance of the evidence, to show there was new evidence or there were changed circumstances that made a change of the children's placement in their best interest.[8] (§ 388; *Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)

Here, the juvenile court made its findings on the credibility of the witnesses and the best interest of the children based on what it found to be "clear and overwhelming" evidence. In addition, we note the following essential difference between the proceedings in *Teresa J.* and those in the case at bar. In *Teresa J.*, both the juvenile court and the public agencies acted under the misconception that the parent could not relinquish her parental rights to a private adoption agency. There is nothing in the record before us suggesting that the juvenile court failed to understand that the parents could relinquish their parental rights to a private adoption agency.

More importantly, unlike the instant action, there never was a hearing in *Teresa J.* concerning the merits, based on the child's best interest, of the relinquishment of parental

---

[8] In reviewing the documentation of the parents' relinquishment of parental rights, we found documents attached to motions by the S.s that were executed by father waiving his parental rights and notice of all future hearings. The documents purportedly executed by mother relinquishing her parental rights were not attached to the S.s' motions and were not introduced into evidence at the section 388 hearing. Although no party has challenged the sufficiency of the evidence concerning whether mother executed a voluntary relinquishment, we find the absence of these documents and the absence of an acknowledgment of receipt by DSS to be troubling.

We further note that the declaration under penalty of perjury by Alison Foster Davis states that mother executed the voluntary relinquishment and it was sent to DSS. For the purposes of our analysis, we assume that mother executed a voluntary relinquishment of her parental rights.

rights to a private adoption agency. The juvenile court in *Teresa J.* merely found the relinquishment invalid. (*Teresa J.*, *supra*, 102 Cal.App.4th at p. 370.) Here, in contrast to *Teresa J.*, the juvenile court conducted a full section 388 hearing considering the merits of the points raised by the parties, taking considerable evidence, and making its findings based on the children's best interest. We, therefore, reject the S.s' argument that the juvenile court misunderstood or misapplied the parties' burden of proof and/or the legal standard to apply in cases involving relinquishment of parental rights to a private adoption agency.

This brings us to father's contentions that the juvenile court misapplied *Teresa J.* and failed to find that it was not in the children's best interest for the parents to relinquish the children to a private adoption agency. Father requests that we remand this case for a determination by the juvenile court as to whether the parents' rights to relinquish to a private adoption agency should be limited.

Father's first point is that whether the relinquishment is to a public or private adoption agency, "the result is the same – the parent has chosen a relative to adopt the child, thus participating in the process, avoiding the delay expected in appeals, and relieving the juvenile court of the obligation to do anything but designate Family Connections [adoption agency] as the adoption agency."

We find this to be a misreading of the holding of *Teresa J.* Like the S.s, father is seeking to expand Family Code section 8700 and *R.S.* to include private adoption agencies as well as public ones. We will not do so. As explained in detail above, *Teresa J.* and section 361(a) leave the juvenile court with far more responsibility in evaluating relinquishment to a private adoption agency than to merely designate Family Connections as the adoption agency. In all matters, the court must evaluate whether the children's best interest is being served.

33

Finally, we reach father's contention that the juvenile court failed to find whether it was in the children's best interest for the parents to relinquish their parental rights to a private licensed adoption agency. The juvenile court found it was in the best interest of Leslie and Laylah to stay with the foster parents, it was not in the best interest of the children for the private adoption to go forward, the testimony of the S.s was not credible, the testimony of the C.s was credible, and the testimony of the public health nurse and social workers was credible. The court found by clear and overwhelming evidence that it was in the best interest of Leslie and Laylah to stay in the care of the C.s who properly cared for them in all apparent ways and provided a safe, stable, and caring family.

The juvenile court's finding that it was not in the best interest of the children for the private adoption to move forward was tantamount to an express finding that it was not in the children's best interest for the parents to relinquish their parental rights to a private adoption agency. There is little or no substantive difference between the court's actual finding and the one father seeks to have the juvenile court elaborate on upon remand. We also find that given the juvenile court's other express findings, there is no doubt how the court weighed issues of credibility and that the court found, if not expressly then impliedly, that it was not in the best interest of the children for the biological parents to relinquish their parental rights to a private adoption agency.

Furthermore, the juvenile court's finding that it was in the best interest of the children to remain in the care of the C.s, a finding made by clear and overwhelming evidence, superseded the need for a finding that parental relinquishment to a private adoption agency was or was not in the best interest of the children. We reach this conclusion because, unlike *Teresa J.*, the parties here fully adjudicated all issues concerning the best interest of the children, including those involving ultimate custody, care of the children, and the strength of the children's bonds to the foster parents and the family members.

34

There is no reason to remand this case for further findings by the juvenile court. We reject all of the petitioning parties' relinquishment arguments.

## SUFFICIENCY OF THE EVIDENCE

The S.s argue at length that the evidence adduced at the hearing favored their section 388 petition. The S.s argue the C.s did not provide proper care for the children and the S.s would be better caregivers. The S.s reargue the evidence concerning what they believe are deficiencies in the C.s' ability to provide the children with love and emotional support. They also challenge the C.s' ability to deal with the children's speech development, care of MRSA and folliculitis, treatment of asthma and the failure to provide medications, and the failure to follow medical advice and obtain medical services.

The S.s fault the department for failing to more diligently search for relatives. The S.s reargue the evidence concerning whether the children were in a safe and secure environment. Finally, the S.s contend the juvenile court abused its discretion and was biased by showing a negative attitude toward them. We reject these contentions.

A party may petition the juvenile court to vacate or modify a previous order on grounds of change of circumstance or new evidence. (§ 388, subd. (a).) The parent or other party must also show that the proposed change would promote the best interests of the child. (§ 388, subd. (d); Cal. Rules of Court, rule 5.570; *Stephanie M., supra,* 7 Cal.4th at p. 317.)

The parent or petitioner bears the burden of showing in a section 388 petition, that both a change of circumstance exists *and* that the proposed change is in the best interests of the child. (*Casey D.*, *supra*, 70 Cal.App.4th at p. 47.) The petitioners at the section 388 hearing had the burden of proof, by a preponderance of the evidence, to show there was new evidence or there were changed circumstances that made a change of the

35

children's placement in their best interest. (§ 388; *Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)

Our review of the juvenile court's finding for sufficiency of the evidence requires that all reasonable inferences be given to support the findings and orders of the juvenile court. Issues of fact and credibility are determined by the juvenile court, not this court. The record must be viewed in the light most favorable to those orders and in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the juvenile court's order. (*In re Tanis H.* (1997) 59 Cal.App.4th 1218, 1226-1227 (*Tanis H.*).)

The juvenile court's findings may not be disturbed if supported by substantial evidence. Issues of fact and credibility are questions of fact for the juvenile court to decide, not this court. The juvenile court's broad discretion to determine what best serves the interests of the children will not be reversed absent a clear abuse of discretion. To abuse its discretion, the juvenile court's decision must exceed the limits of legal discretion by being arbitrary, capricious, or patently absurd. (*Tanis H.*, *supra*, 59 Cal.App.4th at p. 1227.)

There were undoubtedly conflicts in the evidence presented by the parties in the hearing. The juvenile court, however, resolved the issue of credibility in favor of the department's social workers, the public health nurse, and the C.s. The court found the S.s not to be credible in their testimony. We read the record in the light most favorable to the prevailing party and the juvenile court's rulings.

The evidence adduced at the hearing indicates that the C.s deeply care for the children and cared for their outbreaks of MRSA and folliculitis by taking them to the doctor, giving them bleach baths as directed, and providing them with antibiotics. The C.s administered treatment for the girls' asthma. When the girls went on their first overnight visit, Mrs. C. explained she had very little time to get their things together and

36

did not provide them with an inhaler. Mrs. S. testified there was a second overnight visit when this occurred, but conceded that inhalers were provided for the remaining overnight visits.

There was a dispute concerning whether the C.s followed through with a referral to an endocrinologist. Nurse Moreland explained that the C.s did follow through by taking Leslie to the doctor for blood work. Nurse Moreland further explained that Valley Children's Hospital kept refusing the request by the children's doctor for a consult with an endocrinologist. It was later discovered that Valley Children's Hospital tested Leslie shortly after her birth and found she did not have a genetic disorder. Leslie and Laylah had several serious medical issues. There was substantial evidence that the C.s provided the children with adequate medical care, taking them to the doctor as necessary (a regular occurrence for both children) and providing care for them at home with antibiotics, bleach baths, nebulizers, inhalers, and over-the-counter medication.

Throughout the proceedings the S.s challenged whether the C.s should have had the children in what they referred to as daycare. The S.s further challenged the C.s' ability to deal with the children's delayed language skills. The evidence adduced at the hearing was that the C.s did not place the children in daycare, but into a Head Start program in a local school. According to Nurse Moreland, this was an appropriate response to the girls' delayed language skills. In addition, the C.s had been referred to the Kern Regional Center for evaluation of this issue, and according to Nurse Moreland, the C.s followed up with the referral.

There was evidence before the juvenile court that the girls loved the C.s and ran back to see them after overnight visits. Mr. and Mrs. C. clearly loved both children and wanted to adopt them. Social Worker Albertson thought Mrs. C. "was concerned about a situation such as this unfolding," a "debate over where the children should be." The C.s wanted to keep the girls. Mrs. C.'s concerns turned out to be well-founded.

37

Nevertheless, Mrs. C. testified that she wanted to adopt both girls. Mr. C. was 100 percent in favor of adoption.

We do not read the record as showing that Mr. and Mrs. S. were unsuitable caregivers. The department found at the conclusion of the Team Decision Meeting that both the S.s and the C.s were appropriate potential adoptive parents. By the time the joint hearing began, however, the children had been in the C.s' continuous and uninterrupted custody for just over 16 months. At the conclusion of the hearing in September 2013, the C.s had been the children's sole caregivers for over 19 months. There was substantial evidence before the juvenile court that the C.s were excellent caregivers who loved the children, formed deep bonds with them, and were unwavering in their desire to adopt both children.

The S.s also challenge whether the department's initial search for relatives was thorough enough. According to the testimony of social workers, the Legislature changed the law to require more exhaustive searches for relatives of children who enter into dependency proceedings. There was no search unit in the department when Leslie and Laylah became dependent children.

There is no dispute, however, that the department followed the dependency law in effect at the beginning of the dependency. Section 361.3, subdivision (c)(1) creates a preference for relative placement at the beginning of a dependency. The department contacted the maternal and paternal grandmothers, but neither one was aware of a family member willing to care for the children. At the very beginning of the dependency, father was not established as a father. There was testimony from social workers that father's family could not be considered for placement until paternity was established. Father was found to be a presumed father after the jurisdiction hearing in 2012.

The presumption for placement with family members can also occur pursuant to section 361.3, subdivision (d) after there is a change in custody of the children during the

38

dependency proceedings. Such a change never occurred in this case. We further observe there was evidence adduced at the hearing through Social Worker Albertson that the S.s were aware of the dependency proceeding prior to December 2012 and did not immediately come forward. The juvenile court was entitled to give the S.s' testimony concerning their knowledge of the proceedings the weight the court thought it deserved. It is not the task of this court to reweigh the evidence.

The S.s contend the juvenile court generally abused its discretion and acted in a biased manner toward them and their counsel. After reviewing the entire record, including the hearing transcripts, we disagree. Judge Palmer carefully weighed all of the evidentiary objections by each of the parties. The court would occasionally find a question repetitive and ask the questioning attorney to move on to the next point. This happened with the S.s' counsel, but also with county counsel, the C.s' counsel, and the other attorneys involved in the proceedings. Judge Palmer was patient and respectful to the parties and their counsel and demonstrated thoughtful deliberation in making his rulings.

Children have a fundamental independent interest in belonging to a family unit and they have compelling rights to be protected from abuse and neglect and to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child. (*In re Marilyn H*. (1993) 5 Cal.4th 295, 306.) In denying the S.s' section 388 motion and leaving the children in their placement with the C.s, the juvenile court did not err.

## DISPOSITION

The petitions for extraordinary writ relief are denied and the juvenile court's order setting this matter for a hearing pursuant to Welfare and Institutions Code section 366.26 is affirmed. This opinion is final forthwith as to this court.

39